## DETERMINED IN THE

# FOURTH DEPARTMENT

### AT

## GENERAL TERM,

### April, 1894.

---

ALFRED C. LEWIS and Another, Respondents, v. BARBARA YAGEL, Appellant.

77  337
80  605
77  337
82  161
77  337
13ap599
77  337
24ap252
77h 337
54ad625
77h 337
f 59ad198

*Building contract — defective work — acceptance by the architect of inferior work — whether omissions are substantial or technical a question of fact — oral contract for extra work — modification of the contract by the architect — the work must be fairly performed and as contracted for — stipulation as to an examination of the work by a referee — parol evidence to vary the writing — underletting the work — evidence of defective work.*

Although one who enters into a contract to furnish materials and perform work of a specified character, to be paid for on performance, may furnish materials and perform work thereunder, yet if it is not done in the manner stipulated no action will lie for compensation, and a substantial performance must be shown unless it has been waived or released.

The right of recovery will not be forfeited by reason of technical, inadvertent or unimportant omissions or defects, but where the defects are substantial and important, running through the whole work, and so essential that the purpose of the owner has not been accomplished, no recovery can be had under the contract.

Where, by a building contract, it is stipulated that the materials shall be of the best or of a specified quality, and the work be performed in the best manner, subject to the acceptance or rejection of an architect, all to be done in strict accordance with the plans and specifications, and to be paid for when completely done and accepted, the acceptance by the architect of a different kind of work or of an inferior material will not bind the owner, and does not relieve the contractor from the agreement to perform according to the plans and specifications, the provisions for acceptance by the architect being but an additional safeguard against defects not discernible by an unskillful person.

HUN—VOL. LXXVII.      43

The question as to whether the omissions of a contractor in the erection of a building are substantial or merely technical and unimportant, is, in most cases, a question of fact, and, as bearing upon such question, it may be proper to consider the evidence as to the value of the work and materials omitted and the amount it would cost to make the building conform to the provisions of the contract.

Although a building contract contains the provision that no work shall be considered as extra, unless a separate estimate in writing for the same shall be submitted by the contractor to the architect and the owner or her agent, and their signatures obtained thereto, yet if the owner of the building in the process of erection makes a valid oral agreement with the contractor performing and furnishing extra work and materials, and the contractor, relying thereon, performs such extra work and furnishes the extra materials, such provision in the contract will not prevent a recovery of the price agreed to be paid therefor.

An architect has not the power to permit such changes to be made in the construction of a building as to deprive the owner of the provisions of a contract which entitle her to a deduction from the contract price of the amount of the difference in value between the work and materials called for by such contract and those actually furnished.

The person contracting for the erection of a building is entitled to have the contract at least fairly if not strictly performed, and the fact that the contractor furnishes a building as useful or of equal money value with the one called for by the contract is not sufficient to entitle him to recover his full compensation therefor, without regard to the provisions of the contract under which it was to be constructed.

Upon the trial of an action brought to recover the amount alleged to be due on certain building contracts, and to recover the value of extra work alleged to have been done and extra materials alleged to have been furnished in the erection of the building in question, a stipulation was entered into as follows :

"It is stipulated that the referee may, at his convenience, at any time before the close of the testimony in this case, or before the case is finally submitted, take with him a person of his own selection and make an examination of the building in question, and that for the purposes of his decision in this case he may take into consideration what he discovers in making the said inspection, but this arrangement is not to be deemed as limiting either party in the further testimony which they shall give upon the trial of this action ; also, that the referee shall make the inspection in such manner, and using such papers in connection therewith, as he shall deem necessary and proper, each party to pay one-half of the expense of the person whom the referee may select, and the expense of such person accompanying the referee shall be paid one-half by each party, to be taxed in with the referee's fees."

*Held,* that the only right conferred upon the referee by such stipulation was to examine the building in the presence of a person to be selected by him, to the end that he might better understand the evidence given upon the reference in relation to the building and the defects and changes therein.

It is a general rule of the law of evidence that all previous negotiations or conferences between the parties are merged in the written instrument, where one exists between them, and in an action brought on such written instrument parol evidence of such previous negotiations is inadmissible.

The breach of a provision in a building contract, that no part of the work contracted to be done should be underlet, except by the written consent of the owner, will not deprive the contractors of their right to recover payment under such contract, especially when sub-contractors were allowed to perform the work.

Upon the trial of an action brought to recover an alleged balance due on a building contract, and to recover the value of extra work alleged to have been done, and extra materials alleged to have been furnished in the erection of the building in question, the defendant has a right to show any defects that exist in the building, and where there has been an omission of the materials provided for by the contract, to show what has been substituted in their place.

The evidence considered and commented upon which is insufficient to sustain a judgment in favor of the plaintiffs, upon the report of a referee in an action brought to recover the amount alleged to be due on certain building contracts, and the value of extra work alleged to have been performed and extra materials alleged to have been furnished in the erection of the premises in question.

APPEAL by the defendant, Barbara Yagel, from a judgment of the Supreme Court in favor of the plaintiffs, entered in the office of the clerk of the county of Otsego on the 8th day of April, 1892, upon the report of a referee.

*James A. Lynes* and *H. D. Luce*, for the appellant.

*W. J. Palmer* and *William H. Johnson*, for the respondents.

MARTIN, J.:

In the complaint as a first cause of action it was alleged that the plaintiffs were co-partners; that on the 2d day of June, 1886, they entered into a written agreement with the defendant to construct two three-story stores, except party walls, plumbing and painting, and to furnish the materials therefor for the sum of $7,700, part of which was to be paid in installments as the work progressed, and at completion, upon the production of the architect's certificate that the work was completed in accordance with the contract, the remainder was to be paid; that they performed such work on their part, and the stores were completed and accepted by the defendant; that she paid them the sum of $7,368.85, leaving unpaid $311.35.

For a second cause of action it was alleged that on the 5th day of

June, 1886, the parties entered into another written contract whereby the plaintiffs agreed to do the area wall work, plumbing, gas fitting, put down two wells, and furnish the labor and materials for all such work for the sum of $587; that they performed the contract upon their part, but that no part thereof had been paid.

For a third cause of action the plaintiffs allege that between the 2d day of June, 1886, and the 10th day of December of the same year, the defendant became indebted to them in the sum of $9,494.26 for work, labor and services rendered and performed and for materials furnished at her request, and for which she agreed to pay that sum; that she has paid thereon the sum of $8,595.91, leaving a balance unpaid of $898.35, with interest from December 11, 1886, for which sum judgment was demanded.

The defendant set up in her answer that all the work performed, and materials furnished by the plaintiffs, were performed and furnished under written contracts which were entered into by and between the parties, and copies of which were made a part of the answer; that the contracts were not fulfilled by the plaintiffs, and by reason thereof she suffered damage to an amount greatly in excess of the amount claimed by them, which was set up as an offset or counterclaim. It was also alleged that she had paid the plaintiffs more than was due upon the contracts between them; that she was not indebted to them in any sum whatever; that certain conditions precedent to the plaintiffs' right of recovery were not performed by them; that the second contract, so far as it related to the area wall, was obtained from her by the fraud and misrepresentations of the plaintiffs, and that it was not performed by them. The answer likewise contained a denial of all the allegations of the complaint not admitted by the answer, and contained allegations that the plaintiffs had been fully paid; that the contracts between the parties had not been either actually or substantially performed by the plaintiffs, and that the defendant had sustained material damage by reason thereof, and demanded judgment for the amount of such damage.

The plaintiffs replied to the defendant's answer, denying each and every allegation thereof, and alleging that each and all of the changes which were made in the construction of the buildings mentioned in the complaint and answer herein, so far as the same differed from the plans and specifications thereof, were made at the request of the

defendant, with her knowledge and consent and under the direction of her architect.

The defendant served an amended answer wherein it was averred that the plaintiffs did not perform the work under the second contract between the parties according to the contract, plans and specifications, and omitted to do the same in a good, proper and workmanlike manner; that they omitted to put in ventilating pipes, and to vent the traps to the water closets and sinks according to the plans and specifications, and as required by the contract for such plumbing; that they omitted to construct the area wall in the same manner as the area wall of the First National Bank building mentioned in the contract; that the same was constructed in an improper, imperfect and unsubstantial manner, and that she sustained damage thereby to the amount of $500, which was set up as an offset or counterclaim in the action.

The plaintiffs' reply to such amended answer denied each and every allegation contained therein respecting the alleged counterclaims, and also alleged that each and all of the alterations and changes or omissions which were made in the work and materials mentioned in the amended answer, so far as the same differed from the plans and specifications, were made at the request of the defendant, with her knowledge or consent, and under the supervision and direction of her architect.

That the work performed and materials furnished, for which this action was brought, were performed and furnished under the two written contracts between the parties, and in pursuance of their provisions, there can be no manner of doubt. Therefore, to a proper understanding of the questions involved on this appeal, it becomes necessary to examine some of the provisions contained in the contracts between the parties.

The first contract between them, which was made June 2, 1886, provided that the plaintiffs should erect, finish and deliver in a true, perfect and thoroughly workmanlike manner, the building mentioned, except plumbing and painting, agreeably to the plans, drawings and specifications referred to, under the direction of Blend, who was an architect, the plaintiffs to furnish all the labor and materials, and to be paid therefor the sum of $7,700, which the defendant agreed to pay in the manner stated in the contract.

Among others, the contract contained the provision that, should the owner or her agent, during the progress of the work, require any alterations of, deviations from, additions to, or omissions in, the said contract, she should have the right to make such changes, and the same should in no way injuriously affect, or make the contract void, but the difference should be added to or deducted from the amount of the contract, as the case might be, by a fair and reasonable valuation. It also provided : " No work shall be considered as extra, unless a separate estimate in writing for the same shall have been submitted by the contractor to the architect and the owner, or her agent, and their signatures obtained thereto."

It contained the further provision that in case of dispute as to the value of extra work or work omitted, the same should be " valued " by two competent persons, one employed by the owner, or her agent, and the other by the contractor, and they should have the power to name an umpire whose decision should be binding on all the parties. By the contract the last payment was to be made when the building was " all " completed, and the drawings and specifications returned to the architect, provided that in each case of payment a certificate should be obtained· from, and signed by, the architect to the effect that the work was done in strict accordance with the drawings and specifications, and that he considered the payment properly due, the certificate, however, in no way lessening the total and final responsibility of the plaintiffs, and the contract provided further that when the work was " all " completed, a certificate should be obtained by the plaintiffs from the clerk of the office where liens are recorded, and signed and sealed by said clerk, that he had fully examined the records, and found no liens or claims recorded against said work, or on account of the plaintiffs. All ceilings were to be seven-eighths of an inch thick instead of one-half of an inch, as mentioned in the specifications, and the floors in the third story were to be one and one-eighth inches in thickness instead of the thickness mentioned therein. The plaintiffs were to take out the sub-cellar windows and doors, and put in stone work in their place, and two small windows, as the owner should direct.

The drawings and specifications were made a part of the contract. In the specifications it was provided that the work was to be executed in the best and most substantial and thoroughly workmanlike man-

ner, according to the true intent and meaning of the particulars and drawings referred to, which were intended to include everything requisite and necessary to the proper and entire finishing of the work, notwithstanding the fact that every item necessarily involved was not particularly mentioned and set forth, and all the work when finished to be delivered up in a perfect and undamaged state without exception. No part of the work under the contract was to be sublet. Each fourth beam in the brick walls was to be anchored with iron anchors, and the timbers were to be also anchored to the end walls. A curb was to be set in front of the building. All brick walls were to be perfectly level and straight and to the proper and exact height, so that the carpenter could size the timbers and place them upon the wall without blocking up with chips or pieces of wood. The front was to be of Philadelphia brick and terra cotta, as shown on elevation. An ash cleaner was to be placed in each chimney. All partitions and brick walls, except when otherwise specified, were to be plastered with two coats of good mortar, made and stacked in heaps at least ten days before being used, and all to be well haired. The first coat was to be put on with sufficient force to secure good, strong clinches, and to be level and well scratched with a tooth-board paddle, and to stand until dry before the second coat was put on. The second coat was to be put on and made straight, true and plumb, and to be left finished under a muffled float in the best manner so as to secure a good and workmanlike job. All the lathing and plastering was to extend down to the floors and up to the door and window jambs, and all the walls to be straight and plumb, and the angles to be maintained sharp and regular in form. Brick " discharging" arches were to be built to take the weight of all brick walls off the lintels over the door and window frames, or other openings. The basement joists were to be two and one-half by twelve inches, the first floor joists three by twelve, the second and third floors and ceiling joists two and one-half by twelve inches and the roof two by seven, all of which were to be laid sixteen inches from center to center. The studding for the basement was to be two by four set sixteen inches from center to center ; for center partition to be four by five and four by six ; for second story to be four by five, four by six and three by six ; for third story to be two by five and three by five. Double plates, two by width of studding, were to be put on all stud-

ding and well spiked.   There were to be put on brick walls in base-
ment oak plates, good, sound, well-seasoned oak, four by eight, well
bedded in mortar.   All floor joists, including ceiling joists, were to
be properly bridged with two rows in each space of two by three
cross bridging, well nailed.   All studding and floor timbers to be
placed sixteen inches from center to center.   All timbers were to be
framed so that important timbers would not require cutting for
chimneys, plumbing pipes, etc., but were to be framed so that the
pipes could pass through or run between them.   All the partitions
shown by the drawings were to be set, all door studs to be set
double, all openings therein to be properly trussed overhead and to
have plates and sills.   Good two-inch axle pulleys were to be placed
in the window frames.   All the lumber for the window and door
frames, the store fronts, for ceiling, inside finish, sash and doors, was
to be clear white pine, well seasoned and dry.   The lumber for the
basement stairs was to be of red oak.   All the treads, risers and
wall strings for inside stairs were to be of good, clear red oak.   The
basement floor was to be seven-eighths of an inch thick, the store
and second-story floors one and one-eighth inches in thickness and
of first quality, well-seasoned, planed and matched Georgia pine.
On the stairs from the street to the second story, good oak rails,
supported by iron brackets, were to be placed on one side.   The
stairs from the street to the second story and from the second story
to the third story, were to be made with one and one-half inch
treads and seven-eighths of an inch risers, and one and one-fourth
inch wall strings, all to be well put up.   The front basement stairs
were to have two-inch treads and one and one-fourth inch risers
and good substantial strings.   The basement stairs for the stores to
have one and one-fourth inch risers, seven-eighths of an inch tread
and good substantial stringers.   Around the landing of the third
story and in the stores, five by five oak newels, rails and two-inch
balusters were to be put up, newels and balusters to be turned.
Grounds were to be set for the mason work.   As to the plumbing,
all necessary clean-out places properly capped, and all necessary Y
branches for water closets and other fixtures were required to be put
in.   The pipes for the water closets and sinks were to be properly
set and connected, all wastes properly trapped and connected with
the soil pipe, and all traps to be well ventilated and connected with

the vent pipes running up through the roof, and cast iron vent pipes were to be put in to pass through the roof and be capped with a globe ventilating cap. · The plumbing work and gas fixtures to be done so that the entire work would be complete in every respect and would include everything requisite and necessary to fully complete it. The plaintiffs were also to put in two driven wells.

The foregoing is the substance of some of the provisions of the contract between the parties, and perhaps all to which we need refer to a proper understanding of the questions involved on this appeal.

The evidence of the defendant was to the effect that a portion of the work on this building was sub-let without the written consent of the owner; that there was no hand rail along the stairway; that there was not a ventilating pipe in the building; that the two wells mentioned in the contract were not driven; that there were no arches over the doors in the basement; that the plastering did not extend down to the floor as required by the contract; that there was but one course of bridging of the joists where the contract required two; that the area wall was not built in accordance with the contract; that no curb was put down as required; that the plastering was improperly done and not according to the provisions of the contract; that the building was not of the height called for by the plan; that the wall was not laid level, but the joists were blocked up with chips and pieces of wood; that a portion of the ornamental brick on the arches in front of the building was left out and plain brick substituted; that the brick work did not fit closely to the window frames; that none of the walls were plastered where the wainscoting was put on; that the mortar which was used for the walls was poor and improperly made, and that the walls were in no respect in accordance with the contract; that there were no clean-outs in the drain as required; that the joists were not placed sixteen inches from center to center as required, but that they were in many instances from eighteen to nineteen inches from center to center; that one door was omitted in the division wall in the basement; that the lumber used in the ceilings, wainscotings and for finishing the building was Norway pine instead of clear white pine; that there were fifty feet of partition omitted in the basement; that the wall plates were hemlock instead of oak; that some of the trussing over

the doors was not put in; that there were no oak wall stringers; that the main stairs were built without oak wall stringers housed on both sides as required, but were constructed without any stringers at all, the stairs resting upon four by six joists; that the valley in the roof was not formed so as to carry off the water; that the basement stairs were of pine, and not oak, as required; that there was no threshold under the north store door; that the coal bins mentioned in the contract were omitted; that the doors to the vault were not trimmed; that the flooring in the third floor was not of the quality specified in the contract, and was seven-eighths of an inch thick instead of one and one-eighth inches; that some of the window frames were falling apart and were braced with iron braces; that in front windows the lights above the transoms were not laid in marginal lines according to the elevation, but consisted of a single light; that the roof was not properly trussed; that the foundation was not constructed in accordance with the contract; that the footings were not of the thickness called for, and that there was running water and a barrel under the center wall; that the area wall was not constructed according to the contract; that the floors were of poor quality of lumber; that two trap doors were omitted; that no place was left to clean chimneys; that the studding at the doors was single instead of double; that there were no caps or bond stones in the piers to support the flagging; that timbers were cut away so as to weaken the structure; that the doors were not of the height required; that the sash cords were of poor quality; that two windows were not hung; that the plumbing pipes were not cased; that the floor beams were not properly anchored or anchored as required by the contract, and that the contract was not complied with in other respects.

While there is a conflict in the evidence as to many of the omissions and changes claimed by the defendant, yet there are numerous instances where the undisputed evidence shows that the plaintiffs have not performed the contract according to its terms and specifications. A careful study of the evidence renders it extremely difficult to discover how it could properly be found that there was a substantial performance of their contract by the plaintiffs.

While the rule relating to substantial compliance with the terms of a building contract may have been by the later decisions some-

what relaxed, yet, as it now stands, we think that where one enters into a contract to furnish materials, and perform work of a specified character, to be paid for on performance, although materials may be furnished and the work performed, still, if it is not done in the manner stipulated, no action will lie for the compensation, and that a substantial performance must be shown unless it has been waived or released. The right of recovery will not, however, be forfeited by reason of technical, inadvertent or unimportant omissions or defects. But where the defects are substantial and important, running through the whole work and so essential that the purpose of the owner has not been accomplished, no recovery upon the contract can be had. Where, by a contract it is stipulated that the materials shall be of the best or of a specified quality, and the work performed in the best manner, subject to the acceptance or rejection of an architect, all to be done in strict accordance with the plans and specifications, and to be paid for when completely done and accepted, the acceptance by the architect of a different class of work or of an inferior material will not bind the owner and does not relieve the contractor from the agreement to perform according to the plans and specifications, the provisions for the acceptance being but an additional safeguard against defects not discernible by an unskillful person. In most cases the question whether the defects are substantial, or technical and unimportant, is a question of fact. (*Glacius* v. *Black*, 50 N. Y. 145; *Woodward* v. *Fuller*, 80 id. 312; *Flaherty* v. *Miner*, 123 id. 382; *Crouch* v. *Gutmann*, 134 id. 45.)

As bearing upon the question as to whether the omissions of the the plaintiffs in this case were substantial, or merely technical and unimportant, it may be proper to consider the evidence as to the value of some of the work and materials omitted, and the amount it would cost to make the building conform to the provisions of the contract. The extra work for which the plaintiffs were allowed, and for which no estimate in writing was made or submitted by the contractor to the architect and owner and their signatures obtained thereto, amounted to the sum of $253.14. The hand rail and brackets omitted would have cost $16.20. The ventilating flues omitted would have cost $112.72 if put in during the erection of the building; after its completion, $255.75. The wells omitted would have cost $85 at the time, and now $100. The arches over the doors

which were omitted would have cost at the time $15; afterwards, $50. The plastering, if done according to the contract, would have been worth $399.12 more than it was as done, including the omission to plaster under the wainscoting and down to the floor. It would have cost $34.80 to put in the bridging that was omitted if done while the building was being constructed, and after its completion it would have cost $68.57. To have constructed the area wall and vaults under the sidewalks as required by the contract, would have cost $24 more than it cost to build them as they were if done while the building was in process of construction; if done afterwards would have cost $40. It would have cost $30 at the time the building was being built to put in the curb which was omitted. It would have cost $200 additional to make the building of the height called for by the plans. It would have cost $9.80 to furnish the ornamental brick omitted if furnished at the time, and $60.40 if put in now. To put in clean-outs to the drains would have cost $6.50 if done at the time; if done now $25. It would have cost about $30 more if joists had been put in sixteen inches from center to center instead of eighteen. The door omitted in the basement would have cost about $11. The value of the materials used for ceiling, finishing and wainscoting was $320.56 less than that provided for in the contract. The partition omitted in the basement would have cost $10.20, and the wainscoting $42.70. The trussing over the doors omitted would have cost $9.60; would now cost $27.60. The oak wall stringers that were omitted would have cost $30 if put in when the building was constructed; to put them in now would cost $75. It would have cost at the time $25 more to build the stairs of oak than pine, and would cost $82.50 now to make them according to the contract. The coal bins omitted were worth $9. It would have cost $10 to trim the doors to the vault. The difference in value between the floor as put down in the third story and that agreed to be put down was $24. It would have cost $8 more to construct the lights above the transoms as required by the contract than as put in. The cost would have been $54.60 to properly truss the roof, and $64 more to fix it so that it would carry off the water. It would have cost $84.64 more to put in the floors of the materials required by the contract than that used. The trap doors omitted would have cost $15. It would have cost $10 for chimney

cleaners omitted. The using of single studding instead of double, as required, made the cost less by the sum of about $5; it would now cost $80 to put in such studding. There are many other items omitted or changed to which we have not referred that were proved on the trial.

The foregoing statement is based upon the evidence of the defendant as to the work omitted, its cost and the difference in the value between the materials and work as furnished, and that called for by the contract. It should, however, be stated that while many of the omissions referred to are conceded by the plaintiffs, their evidence as to the value of the work and materials omitted, and the difference between that furnished and agreed to be furnished varies very essentially from that of the defendant. As to many of the particulars mentioned, it may, I think, be safely said that the question whether the changes and omissions occurred, or were. of the character and extent claimed by the defendant, was a question of fact to be determined by the referee. There are, however, numerous instances in which there is no dispute as to the fact that the building was not constructed in compliance with the contract between the parties, and that, by reason of the omissions or changes made in the materials and manner of construction, the contractors were required to expend a much less sum than it would have cost them to build according to the provisions of the contract. As has already been intimated, it is extremely difficult to see how, under the circumstances of this case, and in view of the character and extent of the omissions and failures to perform the contract as shown by the evidence, it can fairly be said that there was a substantial performance of the contract by the plaintiffs. It may be, however, that the question was one of fact, and that the finding of the referee is sufficiently sustained by the evidence to be upheld.

If, however, it were to be held that there was a substantial performance of the contract, the questions as to whether the plaintiffs were properly allowed for the extra work which they performed for the defendant, and whether the defendant was allowed a fair and reasonable valuation for the differences which should have been deducted from the amount of the contract price by reason of the changes and omissions referred to, must still be determined. As we have seen, the contract provided that no work should be considered as

extra unless a separate estimate, in writing, for the same should be submitted by the contractor to the architect and the owner, or her agent, and their signatures obtained thereto. Confessedly, no such estimate was made or signed, either by the architect, owner or her agent. Thus, the question is presented whether this provision in the contract is a bar to the plaintiffs' right to recover for such extras. In the case of *Sutherland* v. *Morris* (45 Hun, 259), where there was a written contract between the parties which provided : "The contractor will take notice that there will be no extra work done unless agreed upon by the superintendent, the price put in writing and signed," it was held that, in the absence of any evidence showing a compliance with this condition of the contract, the court properly excluded the testimony offered by the plaintiff to prove the furnishing of the materials and labor. In *Woodruff* v. *Roch. & Pitts. R. R. Co.* (108 N. Y. 39), where there was a contract which provided that no claim for extra work should be allowed, unless done in pursuance of a written order from the engineer in charge, and the claim made at the first settlement after the work was done, it was held that where there was no such order the plaintiff could not recover. These authorities perhaps tend to sustain the contention of the defendant, that she was not liable for the extra work done by the plaintiffs, and for which she has been charged by the referee in this action. But we are disposed to think that the cases cited are distinguishable from this case, and if the defendant made a valid, oral agreement with the plaintiffs to perform and furnish such work and materials, and they, relying thereon, performed it, this provision in the contract would not prevent a recovery of the price agreed to be paid therefor.

This brings us to the question whether the defendant was allowed a fair and reasonable valuation for the differences which should have been deducted under that part of the contract which provides that where changes were made, the difference should be added to or deducted from the amount of the contract, as the case might be, by a reasonable and fair valuation. It seems impossible to read the evidence in this case without concluding that the defendant has not been allowed the deductions to which she was fairly entitled under this provision. As already pointed out, the omissions to perform the labor and furnish the materials in accordance with the contract

were many, and the difference in the cost essentially less, so that a fair compliance with the contract required the plaintiffs to make many substantial deductions. It is unnecessary to again call attention to these omissions and changes in detail. Among them will be remembered the change which allowed the plaintiffs to use Norway pine instead of good, clear white pine, and the evidence which shows the difference to have been several hundred dollars. Attention may also be called to the omission to plaster behind the wainscoting, and the inferior plastering that was put upon the walls. If the defendant's evidence is to be relied upon, nearly if not quite two thousand dollars should have been deducted from the contract price to give fair and reasonable effect to this provision. From a careful examination of the evidence we are satisfied that the defendant has not had that fair allowance to which she was entitled, and that the referee erred in not allowing her the difference between the cost of the work and materials used where changes were made and the cost of the materials and work which by the contract were to have been used, and in not allowing her the value of the omitted work and materials. It is quite obvious that these allowances, if properly made, would amount to a substantial sum, and, therefore, the error in omitting to allow them should not be disregarded by this court.

It may be said that these changes were made with the consent of the architect or the defendant, and, hence, that no such allowances should be made. We doubt if the architect had the right to permit such changes without the consent of the defendant, and feel confident that he did not and could not so change the contract as to deprive the defendant of the benefit of the provision which entitled her to such deductions. (*Fitzgerald* v. *Moran*, 141 N. Y. 419.) An examination of the proof bearing upon this question renders it quite manifest that the defendant did not consent to the changes and omissions, upon any agreement, or with the understanding, that she should not have the benefit of the provision in the contract which allowed deductions therefor. We find the evidence insufficient to show any such consent or any waiver of her rights under this provision. The evidence shows that the architect was a subcontractor under the plaintiffs, and also tends to show quite plainly that he did not attend to or guard the interests of the defendant

with that watchful diligence that she had a right to expect. Indeed, the evidence indicates with unpleasant certainty that the architect, contractors, sub-contractors and some of their employees were quite diligent in seeking to obtain advantage of the defendant to the plaintiffs' benefit, instead of trying to perform the contract, or have it performed, fairly and according to its terms and provisions.

The learned referee has found that the value of the building as completed was equal to the value it would have had if constructed precisely as called for by the contract and specifications. This finding, as well as the rulings upon the trial, seem to indicate that the referee was of the opinion that if the plaintiffs furnished a building as useful or of equal money value with the one called for by the contract, they were entitled to recover their full compensation therefor without regard to the provisions of the contract under which it was to be constructed. In this we think he erred. The defendant was entitled to have her contract at least fairly if not strictly performed.

The referee also found that the defendant, about the first of December, duly accepted the building, having before that time taken possession of a portion of it. We think this finding cannot be sustained. The evidence renders it quite clear that there was never any acceptance of the building by the defendant as in full performance of the contract between her and the plaintiffs.

There was an issue between the parties as to one payment of $500. The defendant claimed that she paid the plaintiffs or the architect, who was their agent, $500 in cash November twenty-seventh, and paid an equal amount on November twenty-ninth by the check of her husband. That the plaintiffs received the check is admitted. On the trial the defendant produced a receipt, dated November twenty-seventh, for $500, signed by Blend for the plaintiffs. They contended that the receipt was given for the payment made by the check dated November twenty-ninth, and that no payment in cash was made on the twenty-seventh as was claimed by the defendant, but that the check was in fact given November twenty-seventh, and that the receipt was dated on the day the check was received. The defendant's witnesses testified that the check was given on the day of its date, and not on the twenty-seventh, as claimed by the plaintiffs. The weight of the evidence upon this

issue was on the side of the defendant, and seems well nigh conclusive. While there is some evidence upon the part of the plaintiffs which perhaps tended to show that no such payment was made, and some circumstances may have been testified to which corroborated the plaintiffs' claim, and tended to cast suspicion upon the validity, in some respects, of the receipt produced, still, the evidence of a number of apparently disinterested witnesses was to the effect that the check which the plaintiffs claim was given upon the twenty-seventh of November was not in fact given until the twenty-ninth of that month, and, hence, that the receipt of the twenty-seventh must have been for a payment made at that time. While ordinarily, where there is a conflict in the evidence upon a question, it becomes one of fact to be determined by the jury, court or referee, and their determination should be regarded as final, and while perhaps in this case the question was one of fact for the referee, yet, we are strongly impressed with the idea that the finding in this case was against the weight of evidence.

On the trial the following stipulation was made and entered in the minutes of the referee : " It is stipulated that the referee may, at his convenience, at any time before the close of the testimony in this case, or before the case is finally submitted, take with him a person of his own selection, and make an examination of the building in question; and that for the purposes of his decision in this case, he may take into consideration what he discovers in making the said inspection; but this arrangement is not to be deemed as limiting either party in the further testimony which they shall give upon the trial of this action ; also, that the referee shall make the inspection in such manner, and using such papers in connection therewith, as he shall deem necessary and proper, each party to pay one-half of the expense of the person whom the referee may select, and the expense of such person accompanying the referee shall be paid one-half by each party, to be taxed in with the referee's fees."

The referee, when he made his report, referred to such stipulation and his proceedings under it, as follows : " This action having been referred to me to hear and determine, and having heard the proofs and allegations of the respective parties, and stipulation having been made in open court before the close of the testimony, as

appears at page 1871 of the stenographer's minutes, that the referee might, before the cause' was finally submitted, take with him a person of his own selection, to make an examination of the building in question, and that for the purposes of his decision in this case, might take into consideration what he discovered in making the said inspection; and having made such inspection, and having designated in pursuance of said stipulation, William H. Murphy, a builder and architect, of Cobleskill, N. Y., he, the said Murphy, and the referee, on or about the twenty-fifth of February, made an examination of said building; that said Murphy continued said examination the next day, and made his written report to the referee, signed March 25, 1892. Before making said report, and before said examination, said referee, in writing, made certain inquiries; that said inquiries and reports are hereto annexed, and are made a part of this, my report."

The inquiries referred to by the referee in his report, were as follows :

" Mr. MURPHY, builder, etc. :

" In pursuance of stipulation made by the above parties in the above cause, I desire you to examine the Yagel building in Oneonta, N. Y., with reference to the following points :

" 1. The walls: rear wall, central wall and the area wall, this last being wall under flagging in front of building, and between building and curb. In this, I want your examination to be, reference to quality of stone and brick used, as to construction, and as to whether the rear or middle wall has settled, and if they have, state the cause.

" 2. As to blocks or blocking under floor joists, if found, state extent, and what is used, why used, and effect.

" 3. Plastering: how many coats, whether properly put on and material making plaster.

" 4. What is the difference in value, if any, in the Norway pine used, between that and pine called for by building contract? What is the effect of its use in the value of the building as completed? Examine contract and specifications, and then, from your examination of building, state whether in the construction of the building and the materials, has there been a substantial compliance with the contract. If there has been a material variation in the construction

of the building from that provided in the contract, is the building, as it stands, better or worse by reason of it? What would this building have been worth December 11th, 1886, if built as provided for in the contract and specifications? What was it worth on that day, built as it was? Please answer the foregoing in writing.

"*February* 25, 1892. W. C. LAMONT."

In compliance with this request, Murphy made, signed and sent to the referee the following paper:

"To Wm. C. LaMont, March 24th, 1892. From W. H. Murphy, as inspector on the Yagel block in Oneonta, N. Y. I have examined the same and find it: 1. I find that the foundation in under basement as a partition wall has cracked, and my best judgment is that the same has been undermined by excavation since the erection of the building, and allows the water to flow to and under the said wall, and comes from the embankment under basement floor causing the same;

"2. The rear wall shows a crack to the end of iron girder; is caused by the weather, expansion and contraction by heat and cold; but there is no settling whatever;

"3. The area wall is perpendicular and put up in a good workmanlike manner as such wall should be;

"4. Stone and brick: stone are limestone, as I call good and sound material; brick are good hard brick, and front is hard pressed and ornamented for front;

"5. As regard to the blocking under joist, I find blocks and furring under the same, both under party and partition walls. I do not believe that the same does any damage, as to the settling, or any damage to the building, as it is customary to level up the timber in this way;

"6. The plastering I find to be two coats; wall a green finish and second coat skim finish; a good hard wall;

"7. Interior finish between Norway and white pine. The difference is of no account, except the Norway can be kept better and cheaper; and as to quality, the Norway is No. 1, and is better than white pine in my mind;

"8. In my examination of the building I find that there has been changes from the contract in many details, viz., stairs, closet and

also material and other changes. But as a whole the general erection of the building as to plans and specifications has been in good workmanlike manner, and as to the value of the building in December, 1886, that the changes do not, in my judgment, materially change it. Value: in other words, the change in material and workmanship have not lessened the value of the building in December, 1886. From my examination I am led to believe the building has been most shamefully abused and torn, and has not been properly cared for. It seems to have been the desire of some persons to make it appear as bad as possible in some respects, and this is especially so as to digging around and along the center wall.

"All respectfully submitted,

"W. H. MURPHY.

"COBLESKILL, N. Y., *March* 25, 1892.

| | |
|---|---|
| "To expenses.................................... | $6 50 |
| "Two days examining building.................... | 20 00 |
| "One day making out report...................... | 10 00 |
| | $36 50 " |

Whether the referee, in determining this case, has relied entirely upon the report or opinion of Mr. Murphy, or somewhat upon the evidence taken before him, is not disclosed. That the unverified statement made by Murphy was considered by him, and to some extent made the basis of his decision, is to be inferred from his report. The defendant insists that the course pursued by the referee was illegal and entirely unwarranted by the stipulation of the parties. That it was illegal unless justified by such stipulation there can be no doubt. So that, in deciding this question, it becomes necessary to determine whether the referee was authorized by the stipulation not only to make an examination of the premises in the presence of a person he might select, but also to delegate the power to make such an examination to a third person, to be made in the absence of the referee, and to call upon such third person to make an unverified report, which, if relied upon, substantially determined the questions involved in the case. We think the only right conferred upon the referee by the stipulation was to examine the building in the presence of a person to be selected by him, to the end that he might better understand the evidence which had been given.

by the witnesses in relation to the building and the defects and changes therein. We cannot believe that it was the intent or purpose of the parties to confer upon the referee the absolute right to determine the questions in this case upon his own inspection of the building, or upon the unverified statement or report of a third person as to the facts in issue. and whether there had been a substantial compliance with the contract by the plaintiffs. If such had been their intent, there would have been no reason for the further examination of witnesses, upon the questions involved, provided for in the stipulation. Nor would it seem to have been very necessary to retain the services of the referee after he had designated another person to determine the issues between the parties. If it was the intention of the parties to absolutely submit this case to the decision of this referee, or such person as he should select, irrespective of and uncontrolled by the evidence, then it became an arbitration, and the stipulation effected a discontinuance of the action. (*Larkin* v. *Robbins*, 2 Wend. 505; *Merritt* v. *Thompson*, 27 N. Y. 225; *Jordan* v. *Hyatt*, 3 Barb. 275, 283; *Claflin* v. *Meyer*, 75 N. Y. 260, 266; *Jacoby* v. *Johnston*, 1 Hun, 242; *Keep* v. *Keep*, 17 id. 152.) We do not suppose such to have been the purpose or intent of the parties in making this stipulation, nor that the action was discontinued by reason thereof. We think the insistence of the defendant, that the course pursued by the referee was unwarranted and illegal, must be sustained.

On the trial, during the examination of the plaintiff Lewis, the plaintiffs' counsel asked the following question: " In reference to the portion of the work which was designated by the counsel as subletting, you may state if in your conversation with the defendant it was talked that other persons than yourself would do the wood work, when you were conversing about taking the contract. [Objected to on the ground that the witness should state the conversation, and any conversation prior to or at the time of entering into the contract merges in the writing itself, and is the best evidence. The terms of the contract cannot be impeached by parol. Objection overruled. Exception by defendant.] A. I did. There was competition in the letting of this contract. There were various other persons besides the plaintiffs that put in bids for the work. Q. In conversing with this defendant in reference to the manner in which

the work was to be done, that is, the persons who were to perform the labor, you may state what was said as to who was to do the wood work, whether yourself, or whether you were to make arrangements with others to do the wood work. [Objected to as incompetent and improper; second, the writing itself, the contract, is the best evidence, and any conversation prior to or at the time of entering into the contract is merged in that writing, and the contract cannot be thus impeached or destroyed by parol evidence. Objection overruled. Exception by defendant.] A. I had a talk with Mrs. Yagel, and told her that Potter & Co. would do the wood work if we took the job; that they were our carpenters. She said that was all right; from what she had seen of their work she would as soon have them do it as any one else, and rather." The specifications, which were made a part of the contract, provided: "No part of the work to be underlet, unless by the written consent of the owner, otherwise sub-contractors will not be allowed on the works." While a breach of this provision of the contract would not, perhaps, deprive the plaintiffs of their right to recover payment under it, especially where the sub-contractors were allowed to perform the work (*Beinhauer* v. *Gleason*, 15 N. Y. St. Repr. 227; affd., 29 id. 994), yet it is very manifest that the effect of the evidence, admitted under the defendant's objection, was to contradict or vary the terms of the written contract between the parties. The written contract was that no part of the work was to be underlet unless by the written consent of the owners. The evidence was to the effect that the defendant had consented to such sub-letting previous to the making of the written contract. It is a general rule of the law of evidence that all previous negotiations or conferences between the parties are merged in the written instrument where one exists between them. While to this rule there are several qualifications, the ruling in this case does not fall within any of them, but was, we think, a clear infraction of the rule, as from an inspection of the written contract between the parties it appears to contain their engagements, and to define the object and measure the extent of such engagements, and is presumed to contain the whole of their contract, and, therefore, parol evidence of the previous negotiations between the parties was inadmissible. (*Eighmie* v. *Taylor*, 98 N. Y. 288; *Thomas* v. *Scutt*, 127 id. 133; *Case* v. *P. B. Co.*, 134 id.

78.) It is also a general and well-established rule that parol evidence, when offered to contradict the terms or provisions of a written instrument, is not admissible. While to this rule there are also exceptions, still, the ruling in this case does not, we think, fall within them. The obvious result of the evidence introduced, if given effect, was to show that anterior to the making of the written contract, there had been an agreement between the parties that a portion of the work should be sub-let and performed by others than the plaintiffs. We think this evidence was clearly inadmissible, and that the learned referee erred in admitting it. (*Woodard* v. *Foster*, 64 Hun, 147; affd. on opinion of the General Term, 138 N. Y. 674.)

Henry W. Brown was called and sworn as a witness for the defendant and testified to a thorough inspection and examination of the building, and detailed such defects in the construction and materials as he discovered. Among other things, he found that the belt course of stone was discontinued at the balcony. He was then asked: "And what put in their place?" This was objected to by the plaintiffs as incompetent, and the objection was sustained. We think this was error. The defendant clearly had the right to show any defects that existed in the building, and, where there had been an omission of the materials provided for by the contract, to show what had been substituted in their place.

On the cross-examination of Edward A. Walsh, who was called as a witness for the defendant, after giving the price of pine lumber and stating that only perfectly clear pine was what was called "uppers," he was asked the following question: "You use very little of that compared with the other qualities? [Objected to as immaterial. Objection overruled and exception by the defendant.] A. I don't know how to answer that question. We use cheap lumber; a good deal more of 'selects' than of 'uppers.' Do not use most all 'selects.'" We do not think this evidence was admissible. The question at issue was not as to what was used by others, nor what was in general use; and, hence, what the witness, who was an experienced builder, might or might not have used, was wholly immaterial.

Peter Bogart, who was called as a witness by the plaintiffs, and who testified that he was employed by them to work on the defendant's building, was asked this question: "Did Mr. Lewis frequently tell

you when you was doing this job to do a good job, so that no fault could be found with it?" This was objected to. The objection was overruled and the defendant excepted. The witness answered: "Yes, sir." This was at most a declaration of one of the plaintiffs to a third person, in the absence of the defendant, and was clearly inadmissible.

Our attention has been called to many other rulings of the referee which present grave questions as to their propriety, but as we think the judgment should be reversed for the reasons already given, and as these rulings are not liable to occur upon another trial, we deem it unnecessary to specially discuss them at this time.

HARDIN, P. J., and MERWIN, J., concurred.

Judgment reversed on the law and facts and a new trial ordered, with costs to abide the event.